**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **Kristin Kepreos,** | ) | **CASE NO. 1:10 CV 1540** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Alcon Laboratories, Inc., et al.,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendants.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon defendants' Motion for Summary Judgment (Doc. 29) and plaintiff's Motion for Summary Judgment (Doc. 30).  This case arises out of plaintiff's former employment with defendants. For the following reasons, defendants' motion is GRANTED and plaintiff's motion is DENIED.

<u>**Facts**</u>

This matter was originally filed in the Cuyahoga County Court of Common Pleas and removed to this Court on the basis of diversity of citizenship and federal question jurisdiction. Plaintiff, Kristin Kepreos, filed her Complaint against defendants Alcon Laboratories, Inc.

1

(hereafter, Alcon), Novaritis Corporation[1], William Doran, Jay Jones, Mike Smith, Craig

Vlaanderen, and John Does 1 and 2.  The Complaint sets forth five claims based on federal

and state law arising out of the termination of plaintiff's employment as an account manager

with Alcon. Plaintiff also alleges that defendants maintained a work environment that was

sexually demeaning to women.  This Court previously dismissed defendants Doran, Jones,

and Smith for lack of personal jurisdiction.  Accordingly, the matter is proceeding against

defendants Alcon and Vlaanderen.

The following facts are taken from the evidence submitted by the parties.[2] Alcon

designs, manufactures, and sells ophthalmological products, including surgical and

pharmaceutical eye care products. Its headquarters are located in Fort Worth, Texas.

Vlaanderen, a resident of Texas, is Alcon's Director of Sales for Vitreoretinal.  Vlaanderen

reported to Doran.  Plaintiff began her employment with Alcon on January 2, 2007 as a

Refractive Account Manager (RAM) which duties included selling and marketing Alcon's

refractive lenses to customers. Plaintiff worked out of her home office in Ohio, and made

sales calls in Northern Ohio to promote and educate health care professionals on Alcon

refractive lenses.  (pltf. depo.; Jones depo.)

Until the end of 2009 or beginning of 2010, plaintiff reported to Division Manager

Dave Becker, who reported to Regional Director Vlaanderen.   Jason Tocar became plaintiff's

supervisor around January 2010.  Becker was aware in 2007 that plaintiff had a child with a

---

[1]     The Notice of Removal states that this defendant was voluntarily dismissed in
state court.

[2]     Additional facts will be addressed below pertinent to the individual claims.

2

serious medical condition.  (Becker depo.)  Around January 2010, plaintiff learned that her

daughter might need a heart transplant because of her condition.  Around February 8, 2010,

plaintiff called Tocar "to find out what I needed to do should [her daughter] need this surgery

to put a leave in place."  Tocar informed plaintiff that he would "ask the appropriate people"

in Fort Worth and let her know.  Plaintiff then received a call from Becker who gave her the

name of the person to contact for FMLA leave, but he informed plaintiff that if she was going

to take a leave it would be an administrative leave for investigation of her expenses.  Plaintiff

did not inquire further regarding the latter during this conversation because she was aware

that there was a new system in place for the expenses.  The next day plaintiff called Becker to

ask about the issue of the expenses and administrative leave.  Becker told plaintiff that she

was under investigation for expenses and that she should talk with Jay Jones in Human

Resources.  (pltf. depo.)  Jones is Area Director of Human Resources.

Plaintiff had a credit card issued to her by Alcon for legitimate business charges,

consisting of company-approved entertainment and business travel (hereafter, T&E card).

Alcon paid the monthly billing statement directly to the bank, while Alcon employees with

the T&E card were responsible for accounting for each of their credit card purchases and out-

of-pocket expenses through Alcon's on-line expense reporting system known as Concur.

Concur is an electronic expense management system.  (pltf. depo. and Exs.; Doran depo.)

The Concur expense system guidelines stated that no personal expenses should be charged to

the T&E card, and if such an expense was unavoidably charged, the amount due Alcon would

be automatically deducted from the employee's paycheck.  Plaintiff testified that in signing

the cardholder agreement, she agreed that "if personal expenses were erroneously or

3

unavoidably charged" to the T&E card, she would clearly identify all those items and reimburse Alcon for them on her next expense report.  In addition to agreeing to these terms when signing the credit card application upon her hire, plaintiff also performed an on-line training on business expenses a couple years later.   (pltf. depo. and Exs.)  By e-mail of March 19, 2009, plaintiff was also sent a copy of the expense guidelines by her supervisor, Becker. (Becker decl. Ex.)

Alcon voluntarily adheres to the Advanced Medical Technology Association's Code of Ethics on Interactions with Health Care Professionals (AdvaMed Guidelines) for the purpose of ensuring that the relationship between the medical device representatives and health care professionals are appropriately transparent and comply with applicable laws and regulations.  Alcon trains its sales and marketing personnel to conduct business consistent with these guidelines, and maintains an internal policy on interacting with health care professionals which mirrors the guidelines.  (pltf. depo. and Exs.; Doran depo.)  Defendants provide a synopsis of the  relevant provisions:

> - Employees are prohibited from providing gifts, refreshments, or anything of value to induce or reward favorable decisions about Alcon's products.
>
> - Product training and education environments are promoted that are conducive to effective transmission of information or training.
>
>  -Meals and refreshments provided to health care professionals are limited to "modest" meals and refreshments that are incidental to the educational or training meeting, and all entertainment or recreational events are barred.
>
> - Gifts that are capable of use by the health care professional for noneducational or non-patient-related purposes (such as wine, flowers, gift baskets, gift cards, etc.) are prohibited, as well as all non-educational branded promotional items, regardless of the value of such gifts.

(*Id.*)

4

Shelli Smith was Alcon's Manager of Corporate Card Administration for the relevant period.  She oversees the corporate credit card programs.  According to Smith, Alcon's finance department audits the expense reports for every employee who holds a corporate credit card (the T&E card), or who otherwise submits expenses for reimbursement. The finance department's audits of employee expense reports include manual audits, such as looking for expenses that do not comply with company policy, and data analysis, such as comparing and reviewing trends in spending.  In 2009, Alcon started to add to its audit process analysis of "Level 3" data.  Level 3 data is data transmitted by a merchant to a credit card company.  Some merchants' Level 3 data contains line items details, which is the type of information that appears on a store receipt.  This line item detail in Level 3 data allows Alcon to identify employees who may be using their T&E card to make personal or otherwise improper purchases.  In November 2009, Alcon's finance department began to provide the Human Resources Department with Level 3 reports for 31 Alcon employees who had questionable charges on their T&E cards.  (Smith decl.)

Plaintiff's Level 3 report showed numerous suspicious charges, including purchases from Target for children's clothes, ladies' clothes, crayons, markers, lotion, hairspray, and gift cards, all coded by plaintiff as "office supplies."  (pltf. depo. Ex. S) Defendants state that the amount of personal charges paid for by Alcon amounted to about $1,700 in 2009.  (Doc. 29 at 6)

Susan Rendon has been Alcon's Human Resources Manager since April 2009. Rendon corroborates Smith's testimony that in November 2009, Alcon's finance department provided her department with Level 3 reports for 31 employees who had questionable charges

on their T&E cards.  Within William Doran's organization, 9 employees were flagged with questionable charges: plaintiff, Marty Albrecht, Robert Behee, Danielle Fraser, Dennis Graham, Charles Kalin, Tim Paslawski, John Seelie, and Joseph Wiltsie.  Behee, Fraser, Graham, Kalin, Seelie, and Wiltsie were all disciplined for using their T&E card for personal purchases.  Alcon issued them each a final written warning and required them to make full restitution for their personal charges.  A decision was made to terminate Paslawski, but he resigned first.  (Rendon decl.)  Doran made the decision to terminate Paslawski and plaintiff.  Albrecht was not disciplined because an investigation showed that the expenses were not inappropriate.  (Doran depo.)

According to Becker, plaintiff's supervisor through January 2010, plaintiff twice asked him to return her December 2009 expense report for corrections.  After plaintiff returned her twice-revised expense report from December 2009, there remained on the report personal and other improper expenses marked as "office supplies" and "meals with others."  In 2009, Becker noticed, over the course of a few months, that plaintiff was marking in her expense reports certain charges on her T&E card as "personal."  Becker advised plaintiff that she was not permitted to use the card for personal use.  In response, plaintiff acknowledged that she understood Alcon's policy.  Upon learning about the investigation into plaintiff's inappropriate use of the T&E card, Becker informed Vlaanderen and Jay Jones about this conversation he had with plaintiff.  After learning about plaintiff's Level 3 report, Becker noticed "charges that looked out of place" on her December 2009 expense report, and he called business establishments to inquire as to purchases made with the T&E card.  Becker learned that plaintiff purchased wine and gift cards and reported them on her expense report

6

as  "meals with others."  Becker provided this information to Vlaanderen. (Becker decl. and Exs.; Becker depo.)

William Doran is Alcon's Vice President of U.S. Cataract and Refractive Sales.  He declares the following.  In the first quarter of 2010, the nine employees, listed above, within his division were flagged with questionable charges in Level 3 reports.  The six employees identified in Rendon's declaration received written warnings because of the inappropriate credit card charges, and were required to make full restitution of their personal charges. Plaintiff's and Paslawski's misuse of the T&E card was far more severe than the other six individuals disciplined.  In addition to the amount and frequency of their personal charges, both plaintiff and Paslawski engaged in conduct that violated Alcon's code of ethics governing Alcon's interactions with health care professionals.  For these reasons, Doran determined that they each should be terminated.  Paslawski resigned prior to termination. (Doran decl.)

Vlaanderen testified that at the beginning of 2010, Doran distributed the Level 3 reports for those employees reporting to him, including plaintiff, Albrecht, and Fraser. Vlaanderen was instructed to review the data and report his opinion.   Vlaanderen informed Doran that all three employees' reports should be investigated based on his review.  As for plaintiff's report, Vlaanderen noticed inappropriate expenses beginning in 2008 and increasing thereafter.  He believed that the Level 3 report clearly demonstrated that the items she was "expensing" were not approved and were against Alcon policy.  Given the frequency and "high magnitude" of the expenses, Vlaanderen, along with Doran and Jay Jones, decided to meet with plaintiff in Fort Worth, Texas so that she could be given the opportunity to

discuss the matter in person.  (Vlaanderen depo.)

According to plaintiff, she received a phone call from Dave Becker on Monday, February 15, 2010, at around 6:15 p.m.  Becker advised plaintiff that "you're going to be receiving an e-mail in a couple of minutes with some direction from Craig Vlaanderen. You're to be on a 6:55 a.m. flight tomorrow.  Here's who you need to call when you get there. And you're going to have a meeting with Craig Vlaanderen."  (pltf. depo.)

In an e-mail, dated Monday, February 15, 2010 6:11 p.m., plaintiff was notified by Vlaanderen that "Alcon has received some new level three expense data from MasterCard and their vendors.  During an expense audit, some discrepancies appeared under your account. We would like to give you an opportunity to provide an explanation for some of the discrepancies listed on the attached document.  Unfortunately, given travel schedules, we must request that you fly to Fort Worth tonight and meet with me tomorrow..."  A copy of the seven page Level 3 audit report was attached.  (pltf. depo. Ex. S)

The following morning, plaintiff met with Vlaanderen and Jay Jones at Alcon's headquarters in Texas.  The meeting lasted about 20 minutes.  Plaintiff understood that the purpose of the meeting was to be given an opportunity to explain the personal expenses. Plaintiff testified that she used her personal and business credit cards "interchangeably,"and would "look at both accounts at the end of the month and try to reconcile the best that I could."  If she had "business expenses on her personal account, she would not reimburse for them, or vice versa."  She stated that "they gave me an opportunity to produce some documents, receipts or what not, and fax it back to them on Friday and that I would be placed on administrative leave."  Plaintiff characterized the meeting as "the worst professional

8

experience I've ever been through in my life.  I wasn't brought down there for the indication

on the e-mail.  I was brought down there to basically intimidate me to quit. They were rude.

They were condescending.  They were essentially making fun of me when I was sitting there.

And then ultimately I was threatened by Craig with there's a right way to go and a wrong way

to go.  It's my belief that this was just a formality."  (pltf. depo.)

As plaintiff herself points out, she testified at deposition, "I think I mishandled my

corporate and personal cards . . . Right, wrong or indifferent, I had two cards that looked the

same. I used them interchangeably, and to my own admission, not smart and not good

bookkeeping. But this was not intentional. I did not do anything intentional to try to roll one

over on the company." (pltf. depo.)

Vlaanderen testified that during the meeting, plaintiff told him she "was charging

things to her personal card that were business related and corporate expenses on her personal

card.... She said that it was a mistake, that she was uncertain of how to do it, report expenses,

and that it was acceptable because nobody was telling her otherwise."  (Vlaanderen depo.)

By letter dated February 16, 2010, Jan Jones informed plaintiff that she was being

placed on paid administrative leave while an investigation was conducted into her expense

submissions. (pltf. depo. Ex. T)

By letter dated February 19, 2010, plaintiff notified Vlaanderen:

After reviewing my line items, I understand why I was brought into the home office.
It was never my intention to perform outside of Alcon's policies, procedures or values.
My business and personal credit cards looked exactly the same until recently.  When I
was in a rush I would, on occasion, use my business card for personal items.  When I
would use the business card for personal items I kept an accounting of the personal
charges made and would make up those charges on my personal card or in cash.  I was
not aware nor was there any indication that the handling of my expenses in this way
was a problem- in fact I thought it was acceptable given that every expense report that

9

I ever submitted was approved without question- including the latest.  I have since made changes to the cards to ensure there will be no further mix-ups including adding my picture to my personal card.

Attached you will find the documents you requested.  I have included an itemized explanation of my charges on the spreadsheet you gave to me.  I have included the three Michaels and Kinkos receipts that you questioned me about with a written explanation of the charges.  I have contacted Target's corporate offices to locate the exact itemizations on the dates in question.  I have been told that their systems will not allow them to retrieve transaction information after 90 days... Because of the inability to produce the itemized receipts past 90 days, I have included the items in question on 12/11/09.  I have also included a spreadsheet and itemized bank statement where I used my personal card for business expenses and did not submit for reimbursement...

(pltf. depo. Ex. U) According to defendants, the attached spreadsheet was incomplete, omitting 46 of the questionable purchases, and confirmed that most of the charges were personal and that gift cards were used for staff training, in violation of Alcon's guidelines and policies.

Plaintiff submits her declaration wherein she states that in 2009 and 2010, she personally paid for various business expenses for which she was not reimbursed.  She attaches a spreadsheet (created contemporaneous to her declaration) stating those expenses. Plaintiff states that she did charge personal items to the T&E card in 2009-2010 in the amount of $715.10, while the business expenses that she paid for and which she not receive reimbursement totaled approximately $1,057.75 during that period. (Doc. 33)[3]

---

[3]    Plaintiff originally submitted a declaration (and contemporaneously created spreadsheet) wherein she stated that she paid, but was not reimbursed for, approximately $1,512.08 in business expenses in 2009-2010.  At her deposition, defendants questioned three line items totaling about $454.33 based on discrepancies between bank statements produced by the bank and those produced by plaintiff.  After defendants sent plaintiff a letter asserting that she had fabricated bank documents, plaintiff filed a motion to substitute an amended declaration. Plaintiff contended in that motion that one of the charges in question was erroneously included as a business expense.  As for the other two items,

10

Upon reviewing the information submitted by plaintiff on February 19, Vlaanderen "believed [plaintiff] stole from the organization, and I believe the pattern demonstrated that she saw she could get away with it and expanded on it."  (Vlaanderen depo.)  Jones characterized plaintiff's demeanor during the meeting as "elusive" and "combative," and believed that plaintiff was trying to "deceive" them with her explanation that her personal and business credit cards were used interchangeably because they looked the same.  (Jones depo.)

Vlaanderen recommended to Doran that plaintiff be terminated.  (Vlaanderen depo.)  Doran agreed with the recommendation of Vlaanderen and Jones based on how they portrayed plaintiff's reaction and response to the information presented to her at the meeting.  (Doran depo.)

Vlaanderen flew to Cleveland on February 25, 2010 to inform plaintiff of her termination.  (Vlaanderen depo.)  Dave Becker was also present at this meeting which occurred at the Cleveland Airport Marriott.  (Becker depo.; pltf. depo.)

Plaintiff thereafter filed this Complaint.  Count One alleges a violation of "Title 42, Chapter 126 (Equal Opportunity for Individuals with Disabilities) of the United States Code,"[4] ERISA, and Ohio Revised Code § 4112 based on plaintiff's termination after

---

plaintiff stated that she was "unable to reconcile the discrepancies in the bank statements."  Accordingly, plaintiff submitted the amended declaration reflecting the lower amount of $1,057.75. This Court permitted the modification. Subsequently, plaintiff submitted with her reply brief the declaration of a doctor who states that plaintiff did pay for the business dinner which had been one of the questionable charges.

[4]     In her own motion, plaintiff makes clear that this is a claim for associational discrimination under the Americans With Disabilities Act (ADA), 42 U.S.C. § 12112(b)(4).  (Doc. 30 at 10)

11

advising defendants that she may need to take time off to care for her daughter's medical condition.  Count Two alleges a sexually hostile work environment in violation of Title VII and the Ohio anti-discrimination statute.  Count Three alleges that defendants replaced plaintiff with the son of another employee in violation of  Title VII and the Ohio anti-discrimination statute.  Count Four alleges intentional infliction of emotional distress. Count Five alleges wrongful termination.

This matter is now before the Court upon the parties' cross motions for summary judgment.  The motions will be addressed jointly.

**<u>Standard of Review</u>**[5]

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

---

[5] The Court notes that this Motion for Summary Judgment was filed in May 2011 and, thus, is subject to application of the recent revision of Fed.R.Civ.P. 56, effective December 1, 2010. The advisory comments concerning the 2010 amendments clearly state, however, that the "standard for granting summary judgment remains unchanged."

12

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial.  If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the

13

legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) Exhaustion of Administrative Remedies**

Defendants maintain that plaintiff failed to exhaust her administrative remedies as to her ADA and Title VII claims and, therefore, those claims must be dismissed.  Plaintiff asserted an ADA claim in Count One and Title VII claims in Counts Two and Three.

"Before filing a Title VII claim, a plaintiff must receive a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC) and then file suit within ninety days after receiving the right-to-sue letter."  *Mayers v. Sedgwick Claims Management*, 101 Fed.Appx. 591 (6th Cir. 2004) (citations omitted) "Similarly, a plaintiff seeking relief under the ADA must file suit within ninety days of receiving a right-to-sue letter from the EEOC." *Id.* (citations omitted) "Failure to timely exhaust administrative remedies is an appropriate basis for dismissal of a Title VII or ADA action. The exhaustion of administrative remedies is a condition precedent to a Title VII or ADA action."  *Id.* (citations omitted)

Plaintiff does not dispute that she failed to exhaust her administrative remedies as to her ADA and Title VII claims.  Rather, she asserts that because she also asserted her claims under Ohio Revised Code § 4112, dismissal is not appropriate.  Therefore, plaintiff appears to be abandoning her ADA and Title VII claims.  In any event, because she fails to controvert defendants' assertion that she did not timely exhaust her administrative remedies, the ADA claim asserted in Count One and the Title VII claims asserted in Counts Two and Three are dismissed.

**(2) Count One**

14

### (a) Associational Discrimination

Count One states,

> After being advised that plaintiff may need to take time off to care for her daughter Sarah's medical condition, defendant(s) terminated plaintiff.
>
> On account of defendant(s) actions, defendant(s) have violated Title 42, Chapter 126 (Equal Opportunities for Individuals with Disabilities) of the United States Code, Section 510 of [ERISA], Ohio Revised Code § 4112 and company policy.

(Compl. ¶¶ 21-22).

The claim clearly invokes the ADA.  Plaintiff, however, seems to abandon this claim by asserting that her claim is governed by the Ohio statute which does not require prior exhaustion of administrative remedies.  But, the Ohio statute does not provide for such a claim. Defendant points to *Anthony v. United Telephone Co.,* 277 F.Supp.2d 763 (N.D.Ohio 2002), which states,

> The Sixth Circuit recently held that there is no association handicap discrimination claim under Ohio law. *Smith v. Hinkle Manuf., Inc*., 36 Fed.Appx. 825 (2002):
>
>> The Americans with Disabilities Act prohibits discrimination against a "qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). The Ohio handicap discrimination statute contains no comparable prohibition against associational discrimination. *See* Ohio Rev.Code Ann. § 4112.02. And although Ohio courts sometimes look to federal law for guidance in disability discrimination cases, they do so only insofar as the ADA is "similar" to the Ohio law. *City of Columbus Civil Service Comm'n v. McGlone*, 82 Ohio St.3d 569, 697 N.E.2d 204, 206-07 (1998). The plaintiffs' [associational discrimination] claim under Ohio Rev.Code § 4112.02(A) has no merit.

Plaintiff argues at length that *Anthony* is inapposite because it relies on *McGlone* which did not concern associational disability discrimination.  Nor, plaintiff maintains, has the Ohio Supreme Court spoken on this issue, which, in plaintiff's view, would permit an associational

15

disability claim.  This Court disagrees with plaintiff and finds that the Sixth Circuit, as demonstrated above, has clearly stated that there is no associational handicap discrimination claim under Ohio law.

Notwithstanding plaintiff's insistence that her associational discrimination claim must proceed under the Ohio statute, she proceeds to characterize her claim as "an ADA discrimination claims under the 'association discrimination' provision" and to analyze her claim under the ADA law.  Plaintiff, however, is barred from asserting her claim under the ADA.  Because the Ohio statute has no equivalent provision, this portion of Count One is dismissed.[6]

**(b) ERISA**

Plaintiff asserts that defendant terminated her to avoid the health insurance costs associated with her daughter's possible surgery.  The Sixth Circuit has outlined the requirements for such a claim:

> Section 510 of ERISA states: 'It shall be unlawful for any person to discharge ... a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the [employee benefit]

---

[6]  Even assuming plaintiff could assert an associational disability claim under Ohio law, it fails for the same reasons discussed below with regard to her ERISA claim, which is based on the same allegation.  To establish a prima facie case of associational discrimination under the ADA, plaintiff must show that: (1) the employee was qualified for position; (2) the employee was subject to an adverse employment action; (3) the employee was known to be associated with a disabled individual; and (4) an adverse employment action occurred under circumstances that raise a reasonable inference that the relative's disability was a determining factor in the decision. Americans with Disabilities Act of 1990, § 102(b)(4), 42 U.S.C.A. § 12112(b)(4).  *Stansberry v. Air Wisconsin Airlines*, - F.3d - , 2011 WL 2621901 (6th Cir. July 6, 2011).  As discussed below, plaintiff fails to raise a reasonable inference that her daughter's disability was a determining factor in her termination.

16

plan.' 29 U.S.C. § 1140. In order to state a claim under § 510, [plaintiff] must demonstrate that [defendant] had a specific intent to violate ERISA through either direct or circumstantial evidence. *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir.1997).

*Schweitzer v. Teamster Local 100*, 413 F.3d 533 (6th Cir. 2005).  Plaintiff does not argue that she has direct evidence.  In the absence of such, plaintiff must "state a prima facie case by showing the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employer may become entitled." *Id.*  Following the presentation of such evidence, defendant may "rebut the presumption of impermissible action ... by introducing evidence of a legitimate, nondiscriminatory reason for its challenged action." Plaintiff must then show that the explanation was pretextual. *Id.* Plaintiff herself acknowledges that the ultimate inquiry is whether defendant took its action with the specific intent to interfere with her ERISA benefits.

     Plaintiff's sole support for this claim consists of the following argument:

> Just one month after inquiring about leave for her daughter's heart transplant, Defendants terminated Mrs. Kepreos. It can't be denied that a heart transplant is an expensive, long term endeavor that will have an impact on any employer's insurance program. Mrs. Kepreos maintains that given the proximity of her notification to the company of her need for leave for the heart transplant and the date of her termination, it must be inferred that the termination was made in large part because of the potential impact on Alcon's health insurance costs (not the pretext of stealing from the company as Defendants allege). Since Alcon made the decision to terminate Plaintiff with the specific intent of interfering with her health insurance, Defendants violated §510 of ERISA.

(Doc. 34 at 16) *See also* Doc. 30 at 16 wherein plaintiff also cites "the distraction to the company resulting from plaintiff missing work."

     Defendant argues that plaintiff cannot satisfy her prima facie burden as there is no evidence that Alcon terminated her for the purpose of preventing her from further

entitlements to health insurance benefits.  For the following reasons, this Court agrees.

First, plaintiff does not dispute defendants' evidence that "[i]nformation pertaining to Alcon employees' election of benefits is maintained confidentially within Alcon's benefits department. When an employee elects or makes a change in their benefits, the Company's benefits department does not report this information to human resources or the employee's manager, director, or vice president."  (Susan Rendon decl.)  Accordingly, there is no evidence that any of the decision makers knew that plaintiff used the health benefits provided by Alcon.[7]  Therefore, a specific intent to interfere with the benefits would not be logical.

Second, defendants point to plaintiff's deposition testimony that she had been covered by Alcon's insurance policy during her entire employment with Alcon, and Alcon had paid for the birth of her third child as well as all of her daughter's prior surgeries.  (pltf. depo. 110-111) Plaintiff provides no retort.  This further undermines plaintiff's contention that defendants meant to interfere with her benefits.

Finally, defendants successfully refute the sole basis for plaintiff's ERISA claim-timing.  Plaintiff posits that she was terminated one month after inquiring about leave for her daughter's heart transplant, and "given the proximity of her notification... it must be inferred that the termination was made in large part because of the potential impact on Alcon's health insurance costs."  But, the evidence shows that the review of the Level 3 reports started in 2009. (Smith decl.)  Plaintiff testified that she contacted her supervisor, Jason Tocar, in early February 2010.  More importantly, plaintiff testified that she contacted Tocar to inquire as to

---

[7]     Nor does plaintiff respond to defendants' contention that there is no record of plaintiff's daughter's medical treatment costs or whether such treatment would have any impact on Alcon's health insurance plan.

what she needed to do "should [her daughter] need this surgery to put a leave in place."

Plaintiff's own testimony, then, shows that she only made a general inquiry as to how to take

a medical leave in the event her daughter would need surgery at a future date. No reasonable

factfinder could then make the leap that an inquiry regarding FMLA leave triggered a specific

intent to interfere with health insurance benefits. In fact, plaintiff notified Dave Becker (her

supervisor prior to Jason Tocar) by e-mail of January 24, 2010, that her daughter would not

require a heart transplant.  Plaintiff had stated, "Just an update.  We can take a preventative

option prior to any transplant situation..."  (pltf. depo. Ex. O) On this basis, defendants were

not even on notice that the heart transplant surgery was imminent so as to have the specific

intent to interfere with its costs.

      Based on the evidence, no reasonable factfinder could infer that plaintiff was

terminated for the purpose of interfering with her ERISA health benefits.  Therefore, plaintiff

fails to show a prima facie case. The Court's analysis need proceed no further.

      Even assuming plaintiff has demonstrated a prima facie case, she fails to show pretext.

Defendants have asserted a legitimate, nondiscriminatory reason for plaintiff's termination:

abuse of the T&E card and her failure to accept responsibility for the misconduct.  In

particular, Vlaanderen testified that he believed plaintiff "stole"from Alcon and "the pattern

demonstrated that she saw she could get away with it and expanded on it."  (Vlaanderen depo.

90) Jones testified that during the meeting with plaintiff, she was "combative" and "elusive."

He had the impression that "she was trying to deceive us when we asked questions."  While

addressing her explanation that she confused her personal and business cards because they

looked the same, he found it "very confusing" when attempting to go through each expense.

(Jones depo. 80-81) Doran testified that plaintiff was terminated for "inappropriate use of expenses" based on the information provided to him, and plaintiff's conduct during the meeting as conveyed to him as being "defiant" and unable to explain the expenses.  (Doran depo. 73-74)

Plaintiff maintains that the reason is pretextual as demonstrated by the following.

First, plaintiff asserts that her evidence shows that Alcon actually owes her money given that she actually put more business expenses on her personal credit card than personal expenses on her T&E card.  On this basis, plaintiff contends she did not steal from Alcon.

Second, plaintiff asserts that numerous employees used their T&E cards to purchase personal items, with no offset, and were not terminated.  Rather, they were either counseled or no action was taken.  Most were permitted to repay Alcon after admitting to stealing. Plaintiff, on the other hand, was terminated even though she did not steal from Alcon given that she spent more personally for business expenses than she charged to her T&E card.

Defendants maintain that plaintiff fails to show pretext.  For the following reasons, this Court agrees.

Defendants have asserted the "honest belief rule."  The Sixth Circuit has recently explained that the "general rule provides that 'so long as the employer honestly believed in the proffered reason for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.' " *Jones v. Nissan North America, Inc.,* 2011 WL 3701785 (6th Cir. August 18, 2011) (quoting *Smith v. Chrysler Corp*., 155 F.3d 799, 806 (6th Cir.1998)).  That court recognized that the Sixth Circuit "employs a modified honest-belief approach."  *Id.* (citing *Clay v. United Parcel Serv.,*

20

*Inc.*, 501 F.3d 695, 714 (6th Cir.2007).)  Under such an approach, "'the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made' in order to avoid the finding that its claimed nondiscriminatory reason was pretextual." *Id.* (citations omitted).  The court stated:

> In determining whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. Although we will not micro-manage the process used by employers in making their employment decisions, we also will not "blindly assume that an employer's description of its reasons is honest. Therefore, when the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process unworthy of credence, then any reliance placed by the employer in such a process cannot be said to be honestly held.

*Id.* (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir.2006); internal quotations and other citations omitted).  *See also Bhama v. Mercy Memorial Hosp. Corp.,* 416 Fed.Appx. 542 (6th Cir. 2011) (citations omitted) ("As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.")

As discussed above, defendants have presented evidence that the decision makers had facts that plaintiff intentionally misused her T&E card to pay for personal expenses (which plaintiff coded as "office supplies" or "meals with others") as well as improper expenses (providing gift cards to sell Alcon products).  Plaintiff admitted during the meeting at Alcon's headquarters that she used her personal and business cards interchangeably because they

21

looked alike[8], and that she would then "reconcile" the two accounts "as best she could." Plaintiff knew she was not permitted to use her T&E card for personal expenses because she had acknowledged this to her supervisor, Becker.  Plaintiff recognized at deposition that she was given the opportunity to produce evidence by the Friday after the Tuesday meeting to support her statement that she made up for her personal charges with putting business expenses on her personal credit card.   Plaintiff did provide Vlaanderen a letter and documentation.  Defendants, however, point out that the spreadsheet plaintiff provided as an explanation for personal charges (e.g., she indicates "wrong card") actually omitted some of the questionable purchases.  (pltf. depo. Exs. T and U) Furthermore, in addition to confirming that most of the charges were personal, plaintiff, in fact, corroborated on that spreadsheet that she used gift cards for "staff training" even though this was in violation of Alcon's guidelines and policy.  (pltf. depo. Ex. U) Plaintiff also provided a copy of a personal bank statement showing a $308.80 debit card purchase at a wine bar, and a $22.77 debit card purchase at a gas station- business expenses that she paid for personally.  After being questioned at deposition regarding these charges, plaintiff was granted leave to modify her originally submitted declaration acknowledging that the first was not a business expense, and that she was "unable to reconcile the discrepancies in the bank statements" as to the second.  Later, in her reply brief, plaintiff provided a doctor's declaration stating that the $308.80 was a

---

[8]	Plaintiff seems to argue that she was treated differently from other employees for the same conduct when she points to Jay Jones's deposition testimony that he, too, confused his business and personal credit cards.  Jones, however, testified that on *one* occasion he used his corporate card for a personal expense because the cards looked similar.  This caused him to put the cards in different spots in his wallet so that he would not do it again.  (Jones depo. 100-101) Plaintiff, on the other hand, used the cards interchangeably.

22

business lunch for with plaintiff paid.

Regardless, the evidence plaintiff now submits with her declaration to this Court attempting to show that she paid for business expenses with her personal card is irrelevant to defendants' decision given that they did not have this information at the time the decision was made.  Rather, the evidence supports the honesty of defendants' articulated reason for terminating plaintiff- even if the decision later turned out to be incorrect. Defendants had an "honest belief," based on the results of their investigation, that plaintiff used her T&E card for personal use and then coded the purchases as "office supplies," and purchased gift cards for health care professionals in violation of Alcon's policy.  Plaintiff indicated in the meeting, and in her letter of explanation, that she did not think it was wrong because no one had ever told her not to conduct her expenses in such a way.  But, plaintiff had acknowledged to her supervisor earlier that personal expenses should not be charged to the business card.  In particular, plaintiff's February 19 letter stated, "When I would use the business card for personal items I kept an accounting of the personal charges and would make up those charges on my personal card or in cash."  Aside from acknowledging in the previous e-mail to Becker that she was not permitted to make personal charges to her T&E card, plaintiff testified at deposition that she would "look at both accounts at the end of the month and try to reconcile the best that I could.." (pltf. depo. 149) Thus, plaintiff's deposition testimony undermines her explanation that she "kept an accounting of the personal charges."

Nor does the Court find persuasive plaintiff's assertion that other employees were treated better for more egregious conduct.  Plaintiff submits a chart which appears to show *all* employees involved in the investigation, and, *inter alia,* what action was taken against them

and the amount of money reimbursed to Alcon. (Doc. 30 Ex. 2; Doran depo. Ex. 6) Plaintiff asserts, apparently based on her own interpretation of the chart, that "a majority of them were counseled and repaid the company."  (Doc. 30 at 8) Plaintiff, however, fails to dispute the evidence, discussed above, that there were nine employees under Doran's organization who were flagged with questionable charges and all were investigated. Six were disciplined for using their T&E card for personal purchases, and were issued a final written warning and required to make full restitution for their personal charges.  One was not disciplined because the investigation showed that the expenses were not inappropriate.  Plaintiff and Paslawski were terminated, but the latter resigned first.  (Rendon decl.) Plaintiff cannot dispute the testimony of Doran that the misuse of the card by Paslawski and plaintiff was "more severe that the other six individuals disciplined" because "in addition to the amount and frequency of their personal charges, both [plaintiff] and Mr. Paslawski engaged in conduct that violated the Company's code of ethics governing Alcon's interactions with health care professionals[9]." (Doran decl.)

For these reasons, plaintiff fails to undermine defendants' honest belief that plaintiff intentionally abused her T&E card and was recalcitrant in her position that what she did was not improper given that no one had told her otherwise.

The ERISA portion of Count One is dismissed.

**(3) Count Two**

---

[9]    Doran testified that Paslawski "would use personal money to do things for an office and then expense a gift card to make up that expense back to himself" in violation of Alcon's guidelines and policies. Plaintiff used her T&E card to purchase gift cards for health care professionals in violation of Alcon's policy.

Count Two alleges that defendants permitted and fostered a work environment that was sexually demeaning to women in violation of Title VII and Ohio Revised Code § 4112.

As discussed earlier, plaintiff's Title VII claim has been dismissed for failure to exhaust administrative remedies.  In any event, sexual harassment claims under Ohio Revised Code § 4112 are generally governed by the same standards as sexual harassment claims under Title VII. *Gallagher v. C.H. Robinson Worldwide, Inc.,* 567 F.3d 263 (6th Cir. 2009)(citations omitted).[10]

The elements of the prima facie case of hostile work environment based on sexual harassment are well-established and require a plaintiff to show by a preponderance of the evidence that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) there is a basis for employer liability.  *Thornton v. Federal Express Corp.,* 530 F.3d 451 (6th Cir. 2008) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir.1999)).
The standard for the employer liability element of the prima facie case depends on whether the alleged harasser is the plaintiff's supervisor or a co-worker.

Plaintiff points to the following in support of her claim[11]:

---

[10]    Defendants acknowledge that the Ohio statutory claims do not have the same administrative prerequisites as their federal counterparts.

[11]    Apparently in support of her assertion that defendants tolerated a sexually harassing environment, plaintiff points to Jay Jones's deposition testimony that he was once investigated and disciplined for telling an employee that she had a nice behind.  His bonus and stock options were also negatively affected. (Jones depo.

25

- Doran stated that he had the best view in the house while walking behind plaintiff and another female employee.

- During a dinner in 2009 with refractive account managers, Doran made a comment about placing his wife in different sexual positions to conceive a boy or girl.

- Doran was present, and laughed, when one of his subordinates told a group of other employees that he did his best interviews with girls in bathing suits.

- During a 2008 National Sales meeting, Regional Director Mike Smith hugged a female employee receiving an award on stage and mimicked an erection or had an erection. Doran witnessed the incident and just laughed.

- Mike Smith told plaintiff that she had nice legs and he had been watching her in her boots.

- Mike Smith asked plaintiff whether she knew that people referred to another female employee as "tits on a stick."[12]

The Court evaluates the conduct at issue by both an objective and subjective standard. This Court considers whether (1) a reasonable person would find the environment objectively

---

27-28) There is no evidence that plaintiff was aware of the incident.  Regardless, the fact that Jones was investigated, disciplined, and suffered other financial consequences for the comment does not support plaintiff's assertion that defendants tolerated a sexually demeaning work atmosphere.

[12]   Apparently relying on her declaration filed in support of her earlier opposition to defendants' Motion to Dismiss for Lack of Personal Jurisdiction, plaintiff also asserts that Mike Smith regularly texted and called her.  Plaintiff does not point to any evidence, including her declaration, which shows that Smith's purported telephone calls and text messages to plaintiff were sexually harassing.

26

hostile, and (2) the plaintiff subjectively found the conduct severe or pervasive.[13]  *Gallager v.*

*C.H. Robinson Worldwide*, 567 F.3d 263 (6th Cir. 2009) (citing *Harris v. Forklift Systems,*

*Inc.,* 510 U.S. 17 (1993) ).  In so doing, the Court must take into account the totality of the

circumstances.  *Id.* "[E]ven where individual instances of sexual harassment do not on their

own create a hostile environment, the accumulated effect of such incidents may result in a

Title VII violation."  *Id.* A hostile work environment occurs "[w]hen the workplace is

permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

The Court concludes that these isolated incidents, considered together, are just not

severe or pervasive enough such that a reasonable jury could conclude that defendants created

a hostile work environment.  Accepting all of plaintiff's evidence, no factfinder could

determine that the workplace was permeated with discriminatory intimidation, ridicule, and

insult sufficiently severe and pervasive so as to alter plaintiff's conditions of employment. *See*

*Grace v. USCAR & Bartech Technical Serv., LLC*, 521 F.3d 655, 679 (6th Cir.2008) ("[T]he

occasional comments, which may have been 'offensive utterances,' do not rise to the level

required by the Supreme Court's definition of a hostile work environment ...."); *Clark v.*

*United Parcel Serv., Inc*., 400 F.3d 341, 352 (6th Cir.2005) (finding that the plaintiff had not

made a prima facie showing of hostile work environment when she "depict[ed] isolated

instances rather than an ongoing situation").

---

[13]     The United States Supreme Court in *Harris, supra,* made clear that the standard is
severe *or* pervasive.

Plaintiff fails to state a prima facie case, and the Court need not proceed to other arguments presented by the parties concerning this claim.

Summary judgment is appropriate as to Count Two.

### (4) Count Three

Count Three alleges that defendants replaced plaintiff with the son of another employee in violation of  Title VII and the Ohio anti-discrimination statute.  Again, only the Ohio claim survives, and it is analyzed under the same law applicable to Title VII claims.

Initially, it is unclear whether plaintiff is alleging that this is a claim of gender discrimination.  Defendants point out that plaintiff testified at deposition:

Q.  You're claiming that you were terminated from your employment because of your gender; is that correct?

A.  No, that's not correct.

(pltf. depo. 64).  The fact that plaintiff was replaced by the son of another employee does not violate Ohio Revised Code ¶ 4112, or any anti-discrimination statute.

In her briefing, plaintiff ignores her deposition testimony and argues that she should prevail on her gender discrimination claim.  Even assuming, however, that plaintiff alleged a gender discrimination claim, it fails because she cannot establish pretext, as discussed above.

Summary judgment to defendants is warranted as to Count Three.

### (5) Count Four

Count Four alleges intentional infliction of emotional distress. Under Ohio law, a plaintiff claiming must show the following: (1) the defendant intended to cause plaintiff's emotional distress or should have known that such serious emotional distress would result, (2) the defendant's conduct was outrageous, extreme, beyond all possible bounds of decency, and

utterly intolerable in a civilized community, (3) the defendant's conduct proximately caused the plaintiff's psychic injury, and (4) the plaintiff's emotional distress was so serious that no reasonable person could be expected to endure it.  *Valente v. University of* Dayton, 2011 WL 3156309 (6th Cir. July 27, 2011) (citing *Talley v. Family Dollar Stores of Ohio, Inc*., 542 F.3d 1099, 1110 (6th Cir.2008).

Plaintiff asserts the following facts in support of her claim.  After inquiring as to what steps would need to be taken to miss work in the event her daughter needed heart transplant surgery, defendants advised plaintiff that her business expenses were being investigated.  She received a call on a Monday night at 6:00, and was advised that she needed to be on a plane at 6:55 the next morning for Dallas, Texas.  She was given a seven page spread sheet to respond to.  She had a sleepless night.  At the meeting, she was verbally attacked, and it was clear defendants intended to terminate her.  Plaintiff left the meeting sobbing, and collapsed in the stairwell.  On the way back to the airport, she asked the cab driver to pull over and she vomited. She collapsed at the Cleveland airport, sitting on the ground sobbing.  A security guard had to help her find her car.  Plaintiff's corporate credit card was rejected when she attempted to use it to pay for exiting the airport parking lot.

On this evidence, plaintiff fails to satisfy the elements of her claim.  At a minimum, no reasonable factfinder could conclude that defendant's conduct was outrageous, extreme, beyond all possible bounds of decency, and utterly intolerable in a civilized community. Defendants conducted an investigation of numerous employees whose records showed possible abuse of their T&E cards.  The fact that plaintiff was given short notice of the meeting at Alcon headquarters, was notified the night before an early morning flight, and was

given a brief period of time to respond to the expense report does not show outrageous or utterly intolerable conduct on defendants' part.  This Court is not in a position to question how Alcon conducts this sort of business.  Additionally, while plaintiff may have felt verbally attacked at the meeting which caused her to react very emotionally, these facts do not show that defendants acted beyond all possible bounds of decency.  Furthermore, plaintiff does not present evidence that defendants caused her to suffer a psychic injury that was severe or debilitating.

Summary judgment is appropriate to defendants as to Count Four.

**(6) Count Five**

Count Five alleges wrongful termination.  "Ohio law is clear that the statutory remedies under state and federal anti-discrimination law sufficiently protect an individual against unlawful discrimination and retaliation such that a public-policy tort is unavailable in such cases. " *Balding-Margolis v. Cleveland Arcade*, 352 Fed. Appx. 35 (6th Cir. 2009) (citing *Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240 (2002)).  Accordingly, this claim fails.

Count Five is dismissed.

**<u>Conclusion</u>**

For the foregoing reasons, defendants' Motion for Summary Judgment is granted and plaintiff's Motion for Summary Judgment is denied.

IT IS SO ORDERED.

 /s/ Patricia A.Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 9/21/11

30